**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FORT MCDERMITT PAIUTE AND SHOSHONE TRIBE, P.O. Box 457 McDermitt, NV 89421,                 Plaintiff,       v. THOMAS PRICE, M.D., Secretary, U.S. Department of Health & Human Services, 200 Independence Avenue, S.W., Washington, D.C. 20201,       and CHRISTOPHER BUCHANAN, Acting Director, Indian Health Service, 5600 Fishers Lane Rockville, MD 20857,       and UNITED STATES OF AMERICA,           Defendants. | Case No. _____ |

**COMPLAINT**

Plaintiff Fort McDermitt Paiute and Shoshone Tribe, by and through its attorneys Sonosky, Chambers, Sachse, Endreson, & Perry, LLP, complains and alleges as follows:

## I. INTRODUCTION

1.      Fort McDermitt Paiute and Shoshone Tribe (Fort McDermitt or Tribe) seeks injunctive relief to compel the Secretary to fully fund and award the two remaining disputed provisions of a Compact and Funding Agreement for the operation of certain health care

programs, services, functions, and activities (PSFAs).  After arriving at an impasse in the negotiation of these contracts, Fort McDermitt made a final offer to the agency under the Indian Self-Determination and Education Assistance Act (ISDA), 25 U.S.C. § 5387(b).  The Secretary rejected Fort McDermitt's final offer in its entirety.

2.      Defendants rejected the proposed agreements on several grounds, including that the "amount of funds requested . . . exceed[s] 'the applicable funding level to which the tribe is entitled,'" "'the [PSFA] (or portion thereof) that is the subject of the final offer is an inherent Federal function that cannot be legally delegated to an Indian tribe,'" and "the Tribe cannot carry out the complete list of PSFAs 'in a manner that would not result in a significant danger or risk to the public health.'"  Defendants' assertions are incorrect, and the Secretary has not met his "burden of demonstrating by clear and convincing evidence the validity of the grounds for rejecting the offer," § 5387(d).

3.      By rejecting Fort McDermitt's final offer regarding the proposed employee housing services provision and the recurring funding amounts to which the Tribe is entitled, the Secretary has breached his legal obligations to Fort McDermitt and violated the ISDA.  Fort McDermitt seeks an injunction, compelling IHS to award and fully fund the Compact and Funding Agreement as proposed by Fort McDermitt, as authorized under the special remedial provisions established in 25 U.S.C. § 5331(a).

## II.  JURISDICTION

4.      This Court has jurisdiction over this action pursuant to 25 U.S.C. § 5331(a) of the ISDA, and 28 U.S.C. §§ 1331, 1362.

### III.  PARTIES

5.      Fort McDermitt is a federally-recognized Indian Tribe composed of Northern Paiute and Western Shoshone peoples.  Its headquarters are located in McDermitt, Nevada, and its reservation extends across the Nevada border, encompassing lands in Humboldt County, Nevada and Malheur County, Oregon.  Fort McDermitt is a "Tribe" as that term is defined by the Indian Self-Determination Act at 25 U.S.C. § 5304(e).

6.      Thomas Price, M.D., is the Secretary of the U.S. Department of Health and Human Services (DHHS).  Secretary Price exercises authority delegated to him by Congress to carry out the ISDA and other applicable law.

7.       Defendant Christopher Buchanan is the Acting Director of the Indian Health Service (IHS).  Director Buchanan exercises authority delegated to him by the DHHS Secretary to carry out the Secretary's responsibilities under the ISDA and other applicable law.  IHS is the agency within the DHHS that is responsible for providing, administering and overseeing federal health services to American Indians and Alaska Natives.  As used throughout this Complaint (and unless context commands otherwise), the terms "Secretary," "Director," and "IHS" are used interchangeably.

### IV.  FACTS AND GENERAL ALLEGATIONS

#### A.  The Indian Self-Determination Act

8.      The purpose of the ISDA is to assure "maximum Indian participation" in the provision of services to Indian communities.  § 5302(a).  The Act seeks to achieve this purpose through the "establishment of a meaningful Indian self-determination policy," which provides for the transition of federal programs serving Indian Tribes from IHS operation to tribal operation.  § 5302(b).

9.     When enacting the self-governance provisions in Title V of the ISDA, Congress found that "the Federal bureaucracy, with its centralized rules and regulations, has eroded tribal self-governance and dominates tribal affairs."  § 5381 note (quoting Pub. L. No. 106-260, § 2(3), 114 Stat. 711 (2000)).  Therefore, the self-governance program "was designed to improve and perpetuate the government-to-government relationship between Indian tribes and the United States and to strengthen tribal control over Federal funding and program management."  *Id*. (quoting Pub. L. No. 106-260, § 2(4)).

10.     In enacting Title V, Congress called for "full cooperation" from the Secretary and his constituent agencies "in the implementation of tribal self-governance," including "to permit an orderly transition from Federal domination of programs and services to provide Indian tribes with meaningful authority, control, funding, and discretion to plan, conduct, redesign, and administer programs, services, functions, and activities (or portions thereof) that meet the needs of the individual tribal communities." *Id.* (quoting Pub. L. No. 106-260, § 3(2)(F)).

11.     Under Title V of the ISDA, "[t]he Secretary shall negotiate and enter into a written compact [and a written funding agreement] with each Indian tribe participating in self-governance in a manner consistent with the Federal Government's trust responsibility, treaty obligations, and the government-to-government relationship between Indian tribes and the United States."  § 5384(a); *see* § 5385.

12.     "Each funding agreement required under subsection (a) of this section shall, as determined by the Indian tribe, authorize the Indian tribe to plan, conduct, consolidate, administer, and receive full tribal share funding, including tribal shares of discretionary Indian Health Service competitive grants . . . , for all programs, services, functions, and activities (or portions thereof), that are carried out for the benefit of Indians because of their status as Indians

without regard to the agency or office of the Indian Health Service within which the program, service, function, or activity (or portion thereof) is performed." § 5385(b)(1).

13.     Title V includes broad authority for PSFAs to be included in a tribal funding agreement. *See* § 5385(b)(2). According to Title V, "[i]t shall not be a requirement that an Indian tribe or Indians be identified in the authorizing statute for a program or element of a program to be eligible for inclusion in a compact or funding agreement under this subchapter." § 5385(c).

14.     Under Title V, "[a]n Indian tribe may redesign or consolidate [PSFAs] (or portions thereof) included in a funding agreement . . . and reallocate or redirect funds for such [PSFAs] (or portions thereof) in any manner which the Indian tribe deems to be in the best interest of the health and welfare of the Indian community being served, only if the redesign or consolidation does not have the effect of denying eligibility for services to population groups otherwise eligible to be served under applicable Federal law." § 5386(e).

15.     Under Title V, "[t]he Secretary shall provide funds under a funding agreement under this subchapter in an amount equal to the amount that the Indian tribe would have been entitled to receive under self-determination contracts under [Title I of this subchapter], including amounts for direct program costs specified under section 5325(a)(1) of this title . . . ." § 5388(c). Title I mandates that the direct program funding "shall not be less than the . . . Secretary would have otherwise provided for the operation of the programs[.]" § 5325(a)(1).

16.     When an Indian tribe withdraws from a participating intertribal consortium or tribal organization:

> (A) the withdrawing Indian tribe . . . shall be entitled to its tribal share of funds supporting those programs, services, functions, or activities (or portions thereof) that the Indian tribe will be carrying out under its own . . . compact and funding agreement (calculated on the same basis as the funds were initially allocated in

the funding agreement of the inter-tribal consortium or tribal organization); and (B) the funds referred to in subparagraph (A) shall be transferred from the funding agreement of the inter-tribal consortium or tribal organization . . . .

§ 5386(g)(2).

17.    When a tribe submits a final offer, the Secretary has 45 days to review that offer.

§ 5387(b).  If the Secretary rejects that offer, the Secretary must provide

a timely written notification . . . that contains a specific finding that <u>clearly demonstrates</u>, or that is supported by a controlling legal authority that—

(i)    the amount of funds proposed in the final offer exceeds the applicable funding level to which the Indian tribe is entitled under this subchapter;

(ii)    the program, function, service, or activity (or portion thereof) that is the subject of the final offer is an inherent Federal function that cannot legally be delegated to an Indian tribe;

(iii)    the Indian tribe cannot carry out the program, function, service, or activity (or portion thereof) in a manner that would not result in significant danger or risk to the public health; or

(iv)    the Indian tribe is not eligible to participate in self-governance.

§ 5387(c)(1)(A) (emphasis added).

18.    If the Secretary rejects a final offer, the Secretary must also provide "the Indian tribe with the option of entering into the severable portions of a final proposed compact or funding agreement, or provision thereof, (including a lesser funding amount, if any), that the Secretary did not reject, subject to any additional alterations necessary to conform the compact or funding agreement to the severed provisions."  § 5387(c)(1)(D).

19.    In a civil action challenging the Secretary's rejection of a final offer under one of the four reasons listed in paragraph 17, above, "the Secretary shall have the burden of demonstrating by clear and convincing evidence the validity of the grounds for rejecting the offer (or a provision thereof)."  § 5387(d).

## B. Fort McDermitt's Contract History

20.     In January 2013, Fort McDermitt designated the Pyramid Lake Paiute Tribe (Pyramid Lake) as its "tribal organization" for purposes of contracting to operate its Emergency Medical Services (EMS) program under the ISDA.  *See Pyramid Lake Paiute Tribe v. Burwell*¸ 70 F. Supp. 3d 534, 539 (D.D.C. 2014); 25 U.S.C. § 5304(*l*) (defining tribal organization).

21.     IHS and Pyramid Lake got into a dispute over the amount of funds available for the Fort McDermitt EMS contract.  70 F.Supp. 3d at 542.  IHS claimed the amount available for the contract was $38,746, which constituted Fort McDermitt's "tribal share."  *Id.* at 544.  However, Pyramid Lake requested $502,611 for the contract, as that was the amount IHS had been spending to operate that program.  *Id.* at 539, 544-45.  IHS declined to enter the proposed Pyramid Lake contract due to this dispute over available funds.  *Id.* at 539.

22.     Eventually, this matter was resolved in litigation.  The Court ruled for Pyramid Lake and eventually directed IHS to pay $502,611 in direct program costs for the annual EMS contract.  *Id.* at 545; *Pyramid Lake Paiute Tribe v. Burwell*, Case No. 1:13-cv-1771 (CRC) (D.D.C. Jan. 16, 2015) (Final Order) at 3.

23.     Since 2014, Fort McDermitt has contracted with the Indian Health Service under Title I of the ISDA to operate a community health representative program.

24.     In October 2015 IHS was responsible for submitting Fort McDermitt's application for continued funding for the Special Diabetes Program for Indians (SDPI) grant.  The Tribe has received this grant funding since the SDPI began in fiscal year 1998.  According to IHS documents, this funding supported approximately 3.5 of the 8 positions at the Fort McDermitt Clinic when IHS was operating the clinic.

25.     IHS failed to submit this SDPI renewal application in a timely manner, and therefore the grant application was denied.  IHS refused to entertain the Tribe's appeal of this denial.

26.     The SDPI grant funding cannot be renewed until at least 2020.

27.     On February 23, 2016, Fort McDermitt notified IHS that it intended to assume all PSFAs at the Fort McDermitt Clinic by June 1, 2016.

28.     In response to the Pyramid Lake litigation and Fort McDermitt notification letter, IHS sent a notice to Congress indicating it planned to close the Fort McDermitt Clinic.

29.     In April 2016 Fort McDermitt again reiterated its intent to assume all PSFAs at the clinic.

30.     In May 2016 Fort McDermitt rescinded its authorization for Pyramid Lake to contract the EMS program and communicated to IHS its intent to directly operate that program as well.

31.     Fort McDermitt received confirmation in May 2016 that it satisfied the financial criteria to qualify for the Title V self-governance program, and in July 2016 the Tribe formally qualified for and entered the self-governance program.

32.     IHS and Fort McDermitt began exchanging information to begin negotiation of a self-governance compact and funding agreement.  Formal negotiations commenced in July 2016.

33.     Throughout the negotiation period, the Tribe agreed to delay the assumption date multiple times at IHS's request.  By October 2016 over a month had gone by with little progress as IHS had not fulfilled the commitments it had made during the last face-to-face negotiation session at the end of August 2016.

### C.  The Fort McDermitt Final Offer

34.     Due to this impasse, the Tribe submitted a final offer on October 13, 2016, addressing the five substantive issues remaining in dispute.  These issues were: (1) the effective date for the Compact and Funding Agreement; (2) a provision on employee housing services; (3) wording on provisions regarding the transfer of unspent EMS funds that had been awarded to Pyramid Lake for the Fort McDermitt EMS contract in 2015 and 2016; (4) recurring funding amounts for the Fort McDermitt Clinic; and (5) contract support costs.

35.     On November 23, 2016, IHS rejected the final offer in its entirety.

36.     IHS later agreed to resume discussions.  Although the parties were able to reach compromises on some of the open provisions, no agreement could be reached concerning the employee housing services provision and the recurring funding amounts for Hospitals and Clinics (H&C) funding for the Fort McDermitt Clinic.

37.     The Tribe exercised its option to enter "into the severable portions" of the final proposed Compact and Funding Agreement "that the Secretary did not reject," and these agreements became effective December 1, 2016.  25 U.S.C. § 5387(c)(1)(D).

38.     Fort McDermitt brings this action to challenge the Secretary's determinations regarding the employee housing services provision and the recurring funding amounts to which the Tribe is entitled.

### FIRST CAUSE OF ACTION
### (Unlawful rejection of employee housing services provision)

39.     Fort McDermitt incorporates all previous allegations of fact and law into this Cause of Action.

40.     The Tribe proposed a provision in the Funding Agreement for "employee housing services," stating as follows:

**Employee Housing Services** provides management and maintenance of tribally-owned housing units near the Fort McDermitt Clinic site provided to tribal health program employees.

41.     The Tribe explained in its final offer letter that "the proposed language in no way references Federal quarters," but instead "these housing services are an essential part of the Tribe's recruitment and retention of medical professionals and are provided in direct support of the Fort McDermitt tribal health program."  The Tribe explained these services were provided as part of its program to recruit, place and retain qualified health professionals, as authorized by Congress in the Indian Health Care Improvement Act (IHCIA).  *See* 25 U.S.C. §§ 1616c, 1616i, 1616j; *see also id.* § 5385(b)(1), (2)(D) (permitting programs authorized by the IHCIA to be included in ISDA agreements).  The Tribe also noted that similar language is present in other tribal funding agreements.

42.     IHS rejected the proposed employee housing services provision on the grounds that "'the amount of funds proposed in the final offer exceeds the applicable funding level to which the Tribe is entitled,'" and the PSFA "that is the subject of the final offer is an inherent Federal function that cannot be legally delegated to an Indian tribe."  IHS further explained that it alone has the "authority to operate Federal quarters," and since these units were not Federal quarters, including them in the Funding Agreement might be construed to be an "improper imposition or extension of the Federal government's legal and financial liability under the [Federal Tort Claims Act]."  IHS also explained that since the IHS Director is the only one with authority to provide housing in Federal quarters, this function cannot be delegated to the Tribe.

43.     IHS's response ignores 25 U.S.C. § 5385(b)(2)(D), which permits programs authorized by the IHCIA, including an employee housing program, to be included in ISDA agreements.  It also ignores the Tribe's ability to rebudget and redesign under § 5386(e).

44.     The Secretary's response does not meet his high burden to demonstrate by clear and convincing evidence the validity of the grounds for rejecting the offered housing provision. Instead, the Secretary's position responds to an argument about the operation of Federal quarters—an argument the Tribe expressly disclaimed.  This rejection also violates the ISDA's mandate that "the Secretary shall interpret each Federal law and regulation in a manner that will facilitate--(A) the inclusion of [PSFAs] in the agreements entered into under this section; and (B) the implementation of agreements entered into under this section."  § 5363(i).

45.     As the Secretary has not met his statutory burden, this rejection violates the ISDA.  Fort McDermitt is entitled to immediate injunctive relief to award the Funding Agreement provision as proposed.

## SECOND CAUSE OF ACTION
### (Unlawful rejection of proposed recurring Hospitals & Clinics funding amounts)

46.     Fort McDermitt incorporates all previous allegations of fact and law into this Cause of Action.

47.     The ISDA mandates that a Tribe is entitled to receive the same amount of funding the Secretary would have otherwise provided to run the programs under contract.  25 U.S.C. § 5325(a)(1).

48.     During negotiations IHS maintained that the Tribe's H&C funding must be determined by using a "tribal shares table" developed by the agency.  The tribal shares table provided by IHS used fiscal year 2014 funding amounts and was not yet finalized because it had never been agreed upon by the tribes in the area.

49.     The Tribe proposed a recurring funding amount of $1,106,453 for the Tribe's H&C funding, which was based off the most recent expenditure data from FY 2015 that IHS

used to create the FY 2016 budget for the Clinic ($603,842) and the recurring funding amount

ordered by the Court for the Fort McDermitt EMS program ($502,611).[1]

50.     IHS shared data showing it paid Pyramid Lake $502,611 plus contract support

costs to operate the Fort McDermitt EMS program in 2015 and 2016.

51.     IHS declined the total H&C amount proposed by the Tribe, relying instead on a

tribal shares table that reflected fiscal year 2013 funding data—the same document rejected by

the Court in the *Pyramid Lake* case.  IHS maintained that Fort McDermitt was only entitled to a

total H&C amount of $633,417, which was derived from the 2013 total H&C amount (an amount

which included only $38,746 for the EMS program).

52.     This argument—that the Tribe is entitled only to the amounts shown on the 2013

funding table—was rejected by the court in the *Pyramid Lake* case.[2]

53.     IHS acknowledged that the H&C amount it was awarding was not sufficient to

both keep the Clinic open and run the EMS program, and explained that if the Tribe decided to

spend the full $502,611 awarded by the Court for the EMS program, it could not operate all other

PSFAs "'in a manner that would not result in significant danger or risk to the public health.'"

54.     IHS also lowered the Tribe's H&C amount on the ground that of the total amounts

allocated for the Fort McDermitt Clinic according to its tribal shares table, $190,197 had to be

carved out for the Winnemucca Indian Colony.  IHS claimed this split was justified by prior-year

---

[1] EMS program funds are included in the H&C funding line item.

[2] *See Pyramid Lake Paiute Tribe v. Burwell*, Case No. 1:13-cv-1771 (CRC) (D.D.C. Jan. 16, 2015) (Final Order) at 2 ("In this case, IHS had spent over $500,000 to operate the EMS program in the year preceding the Tribe's proposal and had set its budget for the following year at a similar level.  Yet IHS contends that the 'tribal share' that the Tribe can receive if it seeks to operate the program is only $38,746, a funding level so small that it would effectively preclude the Tribe from contracting to operate the program.  IHS's interpretation of its discretion violates [the ISDA] and works a basic unfairness to Indian tribes seeking to contract to operate programs." (citations omitted)).

user population data, which was used to generate amounts on its tribal shares table.  IHS awarded a total H&C amount of $633,417 accordingly.

55.    IHS's recurring funding amounts do not represent what the Secretary would have otherwise expended for operation of these programs and they therefore violate the ISDA.  25 U.S.C. § 5325(a)(1).  IHS's data showed it spent $502,611 to operate the EMS program, and accordingly paid that amount to Pyramid Lake in 2015 and 2016.

56.    IHS may not lower the EMS direct program amount because Fort McDermitt withdrew from the tribal organization it designated to operate that program on its behalf.  *See* § 5386(g)(2).

57.    IHS's historical data showed only two Winnemucca Indian Colony users of the Clinic in the past three years, meaning the Secretary was functionally using all Fort McDermitt Clinic H&C funds for the benefit of Fort McDermitt users.  Yet, IHS set aside $190,197 of Clinic funds for those two users.

58.    Fort McDermitt raised numerous challenges to the user population data IHS relied on in its calculations, explaining that many McDermitt tribal members were actually being wrongly counted as Winnemucca users in the IHS system.

59.    Since IHS's amounts do not reflect what the Secretary was otherwise expending, this rejection violates the ISDA.  The Secretary did not meet his high burden to demonstrate by clear and convincing evidence the validity of the grounds for rejecting the funding amounts proposed by the Tribe.  Fort McDermitt is entitled to immediate injunctive relief requiring the Secretary to award and fully fund the recurring funding amounts proposed and forbidding IHS from reducing the H&C amount based on its allocation for Winnemucca users from its tribal shares table.

## RELIEF REQUESTED

WHEREFORE, the Fort McDermitt Paiute and Shoshone Tribe prays that this Court grant the following relief:

A.      A declaratory judgment that the Secretary acted in violation of the ISDA by rejecting the Tribe's final offer regarding the employee housing services provision and the recurring H&C funding amounts; and

B.      An immediate injunction compelling IHS to enter into the proposed contract terms, including the employee housing services provision; awarding the Tribe additional recurring program funds in the amount of $473,036; and compelling the immediate payment of these funds; and

C.      Costs and attorneys' fees incurred in pursuing these claims, including the litigation before this Court, as provided for under the Equal Access to Justice Act, 5 U.S.C. § 504; 28 U.S.C. § 2412; 25 U.S.C. § 5331(c), and other applicable law; and

D.      Such other monetary, declaratory and equitable relief as this Court may find to be just.

Respectfully submitted this 5th day of May 2017.

SONOSKY, CHAMBERS, SACHSE,
ENDRESON & PERRY, LLP

*s/ Colin C. Hampson*
By:_____
Colin C. Hampson
D.C. Bar No. 448481

600 West Broadway, Suite 700
San Diego, CA 92101
Telephone: (619) 267-1306
Facsimile: (619) 267-1388
champson@sonosky.com

Rebecca A. Patterson, *Pro hac vice pending*
AK Bar. No. 1305028
SONOSKY, CHAMBERS, SACHSE,
  MILLER, MONKMAN & FLANNERY, LLP
900 West Fifth Avenue, Suite 700
Anchorage, AK 99501
Telephone: (907) 258-6377
Facsimile: (907) 272-8332
rebecca@sonosky.net

Attorneys for Plaintiff Fort McDermitt Paiute and
    Shoshone Tribe