UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FORT MCDERMITT PAIUTE AND
SHOSHONE TRIBE,

        *Plaintiff*,

v.

ALEX M. AZAR *et al.*,

        *Defendants*.

Civil Action No. 17-837 (TJK)

## MEMORANDUM OPINION

The Indian Self-Determination and Education Assistance Act provides eligible Indian tribes with the option to contract with federal agencies to directly assume operations of services and programs that those agencies ordinarily provide. This action concerns just such an arrangement. The Fort McDermitt Paiute and Shoshone Tribe negotiated with the Indian Health Service to take over operations of two health programs that that agency had been providing. But the parties reached an impasse on several issues, including, as relevant here, the appropriate amount of federal funding. The Tribe, as the statute provides, submitted a "final offer," which the agency rejected in full. The Tribe now sues.

Before the Court are the parties' cross-motions for summary judgment. For the reasons that follow, the Court will grant the Tribe's motion and deny the agency's motion.[1]

---

[1] In ruling on these motions, the Court considers all relevant parts of the record, including: ECF No. 1 ("Compl."); ECF No. 26 ("Joint SOF"); ECF No. 29-1 ("Tso Decl."); ECF No. 31 ("Pl.'s MSJ"); ECF No. 33-1 ("Defs.' MSJ"); ECF No. 33-3 ("Ward Decl."); ECF No. 36 ("Pl.'s Opp'n"); ECF No. 37 ("Defs.' Opp'n"); and ECF Nos. 11–12 (Joint Appendix, with citations designated as "AR__").

I.   **Background**

   A.   **Statutory Framework**

Congress passed the Indian Self-Determination and Education Assistance Act of 1975 (ISDEAA or "the Act"), 25 U.S.C § 5301 *et seq.*, "to help Indian tribes assume responsibility for programs or services that a federal agency would otherwise provide to the tribes' members." *Navajo Nation v. U.S. Dep't of the Interior*, 852 F.3d 1124, 1126 (D.C. Cir. 2017). Title V of the Act authorizes a tribe to enter into "self-governance compacts" with the Indian Health Service (IHS), an agency of the Department of Health and Human Services (HHS), to shift responsibility to the tribe to operate health services ordinarily provided by IHS. *See* 25 U.S.C. §§ 5381–99.

As part of that arrangement, IHS must negotiate and enter into a written funding agreement with the contracting tribe for the continued provision of federal funds for the transferred services and programs. *See id.* § 5385. Relevant to the dispute here, Title V entitles a contracting tribe to a recurring award not less than the amount "the Secretary [of HHS] would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract." 25 U.S.C. § 5325(a)(1); *see also id.* §§ 5385(g), 5388(c); Defs.' MSJ at 4.[2] That amount is often called a tribe's "Secretarial amount" or "base amount," and it is generally not subject to reduction in future years. *See Seneca Nation of Indians v. U.S. Dep't of Health & Human Servs.*, 945 F. Supp. 2d 135, 143 (D.D.C. 2013); Defs.' MSJ at 4. Indeed, the Act specifically states that that amount "shall not be reduced by the Secretary in subsequent years except pursuant to" a limited set of reasons. 25 U.S.C. § 5325(b)(2). The statute nevertheless provides that, "[n]otwithstanding any other provision in [the Act], the provision of funds under [the Act] is subject to the availability of appropriations and the Secretary is not

---

[2] The IHS is vested with the Secretary's authority under 25 U.S.C. § 1661.

required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under [the Act]." *Id.* § 5325(b).

ISDEAA directs IHS to negotiate in good faith with a contracting tribe. *See id.* §§ 5385(a), 5387(e). But if IHS and a tribe cannot agree on the terms of a self-governance compact or a funding agreement, including funding amounts, the tribe may submit a "final offer" to IHS presenting its position on the issues in dispute. *Id.* § 5387(b). Within 45 days, IHS "shall review and make a determination with respect to such offer." *Id.* If IHS determines to reject a final offer in whole or in part, it must provide timely written notice to the tribe. *Id.* § 5387(c). But a rejection may be based only on the four grounds enumerated in the statute:

> (i) the amount of funds proposed in the final offer exceeds the applicable funding level to which the Indian tribe is entitled under this subchapter;
>
> (ii) the program, function, service, or activity (or portion thereof) that is the subject of the final offer is an inherent Federal function that cannot legally be delegated to an Indian tribe;
>
> (iii) the Indian tribe cannot carry out the program, function, service, or activity (or portion thereof) in a manner that would not result in significant danger or risk to the public health; or
>
> (iv) the Indian tribe is not eligible to participate in self-governance under section 5383 of [Title V].

*Id.* § 5387(c)(1)(A). And the written notice must "contain[] a specific finding that clearly demonstrates" the ground(s) relied on or "is supported by a controlling legal authority." *Id.* "In the absence of a timely rejection of the offer, in whole or in part, made in compliance with subsection (c) of this section, the offer shall be deemed agreed to by [IHS]." *Id.* § 5387(b).

The ISDEAA provides federal district courts with original jurisdiction over claims against the Secretary arising under Title V, including a tribe's claim that IHS improperly rejected its final offer. *See* 25 U.S.C. § 5331(a); *see also id.* § 5387(c)(1)(C) (providing that a tribe may

3

forgo an administrative appeal and "directly proceed to initiate an action in a Federal district court pursuant to section 5331(a)"); *id.* § 5391(a) (confirming that section 5331(a) applies to compacts and funding agreements under Title V). For purposes of a civil action challenging IHS's rejection of a final offer, the Act expressly provides that IHS "shall have the burden of demonstrating by clear and convincing evidence the validity of the grounds for rejecting the offer (or a provision thereof) made under subsection (b) of [§ 5387]." *Id.* § 5387(d); *see also id.* § 5398 (providing generally that the Secretary has the burden in any civil action to show by clear and convincing evidence "(1) the validity of the grounds for the decision made; and (2) that the decision is fully consistent with provisions and policies of [Title V]"). And the Act further authorizes the reviewing court to "order appropriate relief including money damages, injunctive relief . . . , or mandamus . . . (including immediate injunctive relief to reverse a declination finding . . . )." *Id.* § 5331(a).

### B. Factual Background

The Fort McDermitt Paiute and Shoshone Tribe ("the Tribe") is a federally-recognized Indian Tribe composed of Northern Paiute and Western Shoshone peoples. Joint SOF ¶ 1. The Tribe is located on a reservation encompassing lands in Nevada and Oregon. *Id.*

IHS provides health services to the Tribe through the Schurz Service Unit, a division of IHS operating out of the Phoenix, Arizona area "serving multiple tribes through a combination of contracted and direct [health] programs." Defs.' MSJ at 6; *see also* AR 124 (table showing Indian tribes served by the Schurz Service United).[3] Since the 1970s, IHS has operated a health clinic in McDermitt, Nevada, ("the Clinic") through the Schurz Service Unit for the benefit of

---

[3] A "Service unit" is "an administrative entity of the [IHS] or a tribal health program through which services are provided, directly or by contract, to eligible Indians within a defined geographic area." 25 U.S.C. § 1603(20).

4

the Tribe's members. AR 143. The Clinic provides primary outpatient care, substance abuse treatment, diabetes prevention and treatment services, and other community wellness programs. Joint SOF ¶ 4; AR 147. While beneficiaries of the Clinic are mainly members of the Tribe, the Clinic also serves other IHS beneficiaries, including members of the nearby Winnemucca Indian Colony of Nevada ("Winnemucca"). *See* AR 144; Defs.' MSJ at 7.

Since 1993, IHS has also operated the Fort McDermitt Emergency Medical Services ("EMS") program, again mainly for the benefit of the Tribe. *See* AR 144. In January 2013, the Tribe designated a separate tribe, the nearby Pyramid Lake Paiute Tribe ("Pyramid Lake") as its "tribal organization" for purposes of contracting with IHS to undertake operations of the EMS program. Joint SOF ¶ 2.[4] Around that time, IHS had raised concerns with stakeholder tribes that the EMS program "had been exceeding the planned budget for the program for some time," requiring IHS to supplement the program with other resources from the Schurz Service Unit, including revenues collected through operation of the Clinic. AR 144. In July of that year, however, Pyramid Lake submitted a contract proposal to assume operation of the EMS program and requested $502,611 in annual funding—the amount that IHS had expended on the program the prior year. *See* Joint SOF ¶ 3; AR 144–45. About a month later, IHS suspended the EMS program, before formally closing it on September 30, 2013. AR 144–45. IHS then rejected Pyramid Lake's proposal that same day. AR 145.

Pyramid Lake promptly filed an action in this district challenging IHS's rejection. *See Pyramid Lake Paiute Tribe v. Burwell*, 70 F. Supp. 3d 534 (D.D.C. 2014). In its declination letter, IHS had argued that the applicable funding level for the EMS program was zero dollars, as

---

[4] A "tribal organization" is the "recognized governing body of any Indian tribe." 25 U.S.C. § 5304(l). A tribe may, by tribal resolution, authorize a tribal organization to contract with IHS on the tribe's behalf. *See id.* § 5321(a)(1).

IHS had at that point decided to cease operating the program. *See id.* at 539. In the alternative, IHS declined to award Pyramid Lake any funding based on expenditures made using revenues collected from the Clinic, as opposed to the amount actually budgeted for the program by the agency. *See id.* The court rejected those justifications, explaining that the applicable funding level should be determined at the time the contracting tribe submits the proposal and that that amount constitutes what IHS would have *spent* on the program, even if that includes revenue from other sources. *See id.* at 543–44. Accordingly, and after an unsuccessful attempt at further negotiations, the Court ordered IHS to award Pyramid Lake the full $502,611 requested. *See Pyramid Lake Paiute Tribe v. Burwell*, Case No. 1:13-cv-01771 (CRC), 2015 WL 13691433 (D.D.C. Jan. 16, 2015).

About a year later, in February 2016, the Tribe notified IHS that it intended to contract to assume operation of the Clinic. Joint SOF ¶ 5. The following month, IHS sent a notice to Congress indicating that it planned to close the Clinic, explaining that it determined "it [was] not in the best interests of the Indian beneficiaries served by the Schurz Service Unit to fund the EMS program" as ordered by the court in *Pyramid Lake* and also "maintain direct services at the Fort McDermitt Clinic." AR 145. Several months later, the Tribe rescinded its authorization for Pyramid Lake to contract the EMS program on its behalf and notified IHS that it intended to directly operate that program as well. Joint SOF ¶ 7.

In July 2016, the Tribe submitted its draft compact and funding agreement to IHS for assumption of the EMS program and the Clinic and the parties entered into negotiations. *Id.* ¶ 8; *see also* AR 135. By October, the parties had reached an impasse on several issues, including the appropriate level of recurring funding for "hospitals and clinics" ("H&C") that the Tribe intended to operate—that is, the EMS program and the Clinic. *Id.* ¶¶ 8–11; AR 111–13. The

6

Tribe thus submitted a final offer to IHS, under § 5387(b), addressing each of the issues still in dispute. *See* AR 108–29.

IHS rejected each of the Tribe's proposals about the issues in dispute. *See* AR 130–41. Only one of those issues—the level of recurring funding for H&C—remains in dispute. Joint SOF ¶¶ 10–11. In its final offer, the Tribe proposed a recurring amount of $1,106,453 to cover operations of both the EMS program and the Clinic. *Id.* ¶ 12; AR 113. The Tribe arrived at that amount by combining the $502,611 award mandated by the court in *Pyramid Lake* with a projected expenditure of $603,842 for the Clinic, based on a funding table provided by IHS. *See* Joint SOF ¶ 12; AR 112–13. In response, IHS asserted that the Tribe miscalculated the amount of H&C funds available to it. *See* AR 137. According to IHS, the amount requested by the Tribe exceeded the "total H&C budget" for all the programs at issue, and further that it reflected "shares allocable to Winnemucca." AR 138. IHS therefore awarded the Tribe a total of $555,275 in H&C funds for operation of both the EMS program and the Clinic, Joint SOF ¶ 13; AR 52, an amount that, according to IHS, reflects the appropriate funding allocable to the Tribe from the Schurz Service Unit's budgeted resources, *see* Joint SOF ¶ 14; AR 149.

### C. This Case

The Tribe commenced this action in May 2017, challenging IHS's rejection of its final offer under the ISDEAA. *See* Compl. The complaint brings two separate counts alleging that IHS unlawfully rejected the Tribe's proposals: Count I concerns the Tribe's inclusion of employee housing services as part of the funding agreement, *see id.* ¶¶ 39–45, while Count II concerns the level of recurring H&C funds, *see id.* ¶¶ 46–49. The parties cross-moved for summary judgment. *See* ECF No. 14; ECF No. 16.

Following a hearing on those motions, the Court granted the Tribe's motion as to Count I. *See* ECF No. 24. But it denied both parties' motions without prejudice as to the recurring

7

funding issue, explaining that the record lacked sufficient context or supporting affidavits for the Court to make any sense of the parties' competing arguments. *See id.* at 3–6. The Court thus ordered the parties to submit a joint statement of the remaining disputed legal issues and a joint stipulation or statement of undisputed facts, followed by the renewed motions for summary judgment currently before the Court. *See id.* at 8–9; ECF No. 31; ECF No. 33. Those renewed motions are now fully briefed.

## II. Standard of Review

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law," and a dispute "is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Ordinarily when a plaintiff challenges an agency action, review is governed by the parameters set forth in the Administrative Procedure Act (APA), 5 U.S.C. § 500 *et seq.* But the ISDEAA provides a distinct framework for claims brought under it, displacing the familiar standards set forth in the APA. As noted, the Act instructs that in any "civil action conducted pursuant to [§ 5387], the Secretary shall have the burden of demonstrating by clear and convincing evidence the validity of the grounds for rejecting the offer (or a provision thereof) made under subsection (b)." 25 U.S.C. § 5387. And the Court has already concluded that the Act requires that it review IHS's decision to reject the Tribe's final offer *de novo*. *See* ECF No. 24 at 2–3.

Nor does the ordinary deference accorded to an agency's interpretation of the statute it administers apply here. Rather, ISDEAA instructs that "[e]ach provision of [Title V] and each

8

provision of a compact or funding agreement shall be liberally construed for the benefit of the Indian tribe participating in self-governance and any ambiguity shall be resolved in favor of the Indian tribe." 25 U.S.C. § 5392(f); *see also* AR 17 (the Tribe's compact incorporating this provision). Under that standard, when faced with an ambiguity, while a court should "give the agency's interpretation 'careful consideration,'" it should not defer to it. *Cobell v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001) (quoting *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1445 n.8 (D.C. Cir. 1988)); *see also Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 194 (2012) (noting that Title I's model contract requires that the agency "demonstrate that its reading is clearly required by the statutory language" (citing 25 U.S.C. § 5329(c))).

## III. Analysis

IHS rejected the Tribe's final-offer proposal for recurring H&C funding because "the amount of funds proposed in the final offer exceeds the applicable funding level to which the [T]ribe is entitled under [Title V of the ISDEAA]." AR 138 (second alteration in original) (quoting 25 U.S.C. § 5387(c)(1)(A)(i)). To justify that finding, IHS makes two principal arguments. First, IHS claims that the Tribe improperly requests funds from the Schurz Service Unit that were allocated to another tribe—namely, Winnemucca. *See* Defs.' MSJ at 21–23. Second, IHS argues that the Tribe seeks funding based on expenditures made from third-party revenue from the EMS program and the Clinic, funds that *the Tribe*, rather than IHS, will now collect and that IHS therefore cannot be required to award to the Tribe. *See id.* at 24–27.

### A. Winnemucca Share

IHS claims that the Tribe should not receive any funds from the Schurz Service Unit allocated to Winnemucaa. It explains that the Schurz Service Unit has long apportioned funding amounts by each tribe served, even when those funds are then collectively used to support a particular program or service. Accordingly, even though IHS has used both the Tribe's and

9

Winnemucca's shares to fund the Clinic and EMS program in the past, because Winnemucca has not authorized the Tribe to contract on its behalf, the Tribe cannot receive the portion of funding used for the Clinic and the EMS program allocable to Winnemucca. *See* Defs.' MSJ at 17, 22–23; *see also* AR 138 (section of declination letter explaining that the Tribe is not entitled to the Winnemucca allocation).[5] The Court is unpersuaded.

In short, IHS's conception of the appropriate funding amount is foreclosed by the language of the Act. Title V provides that IHS "shall provide funds under a funding agreement . . . in an amount equal to the amount that the Indian tribe would have been entitled to receive under self-determination contracts" under Title I. 25 U.S.C. § 5388(c). And the provision governing funding in Title I states that "[t]he amount of funds . . . shall not be less than the appropriate Secretary would have otherwise provided *for the operation of the programs* or portions thereof for the period covered by the contract." *Id.* § 5325(a)(1) (emphasis added). As the highlighted language makes clear, the minimum level of funding is determined by the *program* covered by the contract, not by the identity of the tribe seeking to operate that program. Put into context, if the Secretary were to retain control of the Clinic, it would provide funding to operate the Clinic, as it has been, with funds that it has internally allocated to Winnemucca. *See* Defs.' MSJ at 21 (noting that a portion of the funds IHS had been using to operate the Clinic

---

[5] When IHS issued its declination letter, Winnemucca had "no functioning governing body from which to obtain views." AR 146. IHS was, however, able to communicate with Winnemucca Chairperson Judy Rojos, who, according to IHS, "expressed no interest in providing a tribal resolution from Winnemucca permitting the Fort McDermitt Tribe to contract for Winnemucca's shares of the Clinic." ECF No. 33-2 ¶ 4. IHS thus presumed that Winnemucca had not authorized the Tribe to contract to operate programs and services on its behalf. *See* AR 138. Because the Court concludes that the appropriate level of funding does not turn on Winnemucca's authorization, the appropriateness of that presumption is immaterial.

were "allocated to the Winnemucca Tribe"). Under the statute, IHS cannot now withhold those funds for operation of the very same program because the Tribe seeks to run the Clinic itself.

Indeed, the court in *Pyramid Lake* rejected an almost identical argument to the one IHS relies on here. In that case, the Secretary argued that she could limit the funding award for operation of the EMS program based on "the tribal share IHS determined the Fort McDermitt tribe was entitled to receive." *Pyramid Lake*, 70 F. Supp. 3d at 544. But the Court disagreed, concluding that "[t]he clearest meaning of [the] term 'would have otherwise provided' in the context of the Act is what the IHS would have otherwise *spent* on the program." *Id.* That amount, the Court reasoned, is not limited to a particular tribe's "budgeted tribal share." *Id.*

Still, IHS points to § 5324(i), arguing that that provision endorses its approach to allocating funding awards under ISDEAA funding agreements. *See* Defs.' MSJ at 22; Defs.' Opp'n at 9. Section 5324(i)(1) states:

> If a self-determination contract requires the Secretary to divide the administration of a program that has previously been administered for the benefit of a greater number of tribes than are represented by the tribal organization that is a party to the contract, the Secretary shall take such action as may be necessary to ensure that services are provided to the tribes not served by a self-determination contract, including program redesign in consultation with the tribal organization and all affected tribes.

25 U.S.C. § 5324(i)(1). IHS would have that provision do too much. To be sure, it clearly obligates IHS to "take such action as may be necessary" to ensure that a tribe that had previously benefitted from a program will not be stripped of its access to those services as a result of any self-determination contract. Yet here there is no need to take such action because the Clinic continues to serve the same population it served prior to the Tribe's assumption. *See* AR 144. The Tribe has not contracted for a "portion[]" of the Clinic. *See* Defs.' MSJ at 22 (quoting 25 U.S.C. § 5324(a)(1)). There has been no "divi[sion] [of] the administration of [the] program." 25 U.S.C. § 5324(i)(1). Rather, the Tribe has assumed operation of same Clinic, with the same

11

regional service, and it is entitled under § 5325(a)(1) to no less than the amount of funds that IHS would have otherwise provided for its operation.

For these reasons, the Court finds that the Tribe is not limited to only those funds allocated to it by IHS, and thus that IHS cannot rely on that justification to reject the Tribe's recurring funding proposal.

## B. Third-Party Revenue

IHS's second justification for rejecting the Tribe's proposal poses the more difficult question. According to IHS, the expenditure figure that the Tribe relied on for the Clinic—the $603,842 amount that it added to the existing $502,611 obligation for the EMS program—was only partially comprised of funding from the H&C budget. *See* Defs.' MSJ at 24–27; Defs.' Opp'n at 6–8. IHS supplemented the rest of the Clinic's operating costs with what it deems "third-party revenue," largely Medicaid reimbursements for services provided by the Clinic and EMS program and a separate grant for diabetes treatment services. *See* Defs.' MSJ at 24; Ward Decl. ¶¶ 8–9; Tso Decl. ¶¶ 7–8. Those resources, IHS points out, are no longer available to IHS because the *Tribe* undertook clinic billing once it assumed operation of the Clinic and the EMS program, and the Tribe therefore receives any income from the programs moving forward. *See* Defs.' MSJ at 24. And IHS insists that it cannot transfer funds to the Tribe that it no longer has. Indeed, because those funds flow directly to the Tribe, IHS argues that accounting for them in the recurring finding amount would lead to "double-dipping" by the Tribe. Defs.' MSJ at 27.

The Tribe insists that this justification must fail at the outset because IHS did not rely on it in the declination letter. *See* Pl.'s MSJ at 21. And what few references IHS made in that letter to third-party revenue, the Tribe claims, cannot constitute a "'specific finding' clearly demonstrating" that the Tribe's proposal exceeded the amount to which it is entitled because it included expenditures from third-party revenue sources. Pl.'s Opp'n at 16 (quoting 25 U.S.C.

12

§ 5387(c)(1)(A)). But even if IHS made an adequate finding under the ISDEAA, the Tribe contends that its justification fails as a matter of law because the recurring funding award is tied to the level of *expenditures*, not the source of funding for those expenditures. *See* Pl.'s MSJ at 22–23.

The Tribe's procedural arguments are well-taken. But the Court need not address them. For even if IHS made a sufficient finding about third-party revenues in the declination letter for purposes of § 5387(c)(1)(A), the Court agrees that that justification fails as a matter of law.

Stepping back from IHS's narrower claim about third-party revenues, its approach to the recurring funding amount rests on a fundamental misunderstanding of the minimum level of funding it must provide to the Tribe under § 5325(a)(1). IHS assumes that the figure should be dictated by the amount it allocated for H&C in its budget, and it spends much of its briefing making the broader point that its internal budgeting figures show that in recent years it spent "nowhere near the $1.1 million amount claimed by Plaintiff." Defs.' MSJ at 21; *see also id.* at 19 (explaining that no document indicates that IHS "spent th[at] much *in Service Unit H&C* on the clinic and EMS programs" (emphasis added)); Defs.' Opp'n at 5 (confirming that IHS based its award on the "*appropriated H&C funding* that IHS would have otherwise spent" (emphasis added)). Indeed, all the evidence IHS musters to support its contention that it would have only provided $555,275 to operate the EMS program and the Clinic—and not the $1.1 million in funding requested by the Tribe—shows that IHS had only *budgeted* that amount or a comparable figure in its H&C line item for the Schurz Service Unit. *See* AR 148 (projected H&C expenditures table for the Clinic attached to declination letter); AR 149 (table showing portion of H&C funding set aside for the Tribe attached to declination letter); AR 125 (table showing a

13

"[b]udgeted [a]llowance" of only $181,778 in H&C for the Clinic in 2016); Tso Decl. ¶ 6 and Ex. 1 at 2 (showing *H&C budgeted* expenditures on the Clinic in 2016 of $221,211).

But as the Court made clear in rejecting IHS's tribal-share argument, § 5325(a)(1) dictates that the recurring funding amount be determined by the funds provided to *operate* a program. The provision does not further cabin that amount based on how and from which sources IHS had been cobbling together those funds. Indeed, if the Court were to accept IHS's position that contracting tribes are limited to only that amount *budgeted* for a program, IHS could dictate the minimum funding amount for any particular tribe by strategically reorganizing its appropriated funds. The Court struggles to square that reading with Congress's "intent to circumscribe as tightly as possible the discretion of the Secretary" in enacting the ISDEAA, *Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1344 (D.C. Cir. 1996), let alone the Court's obligation to "liberally construe[] [Title V] for the benefit of the Indian tribe," 25 U.S.C. § 5392(f). Thus, IHS's insistence that the level of H&C funding budgeted for the Clinic and the EMS program is the definitive benchmark is misguided.[6]

---

[6] To be sure, demonstrating the amount that IHS "would have otherwise provided" for the operation of a particular program in a particular year is ultimately an evidentiary burden put to the government. *See* 25 U.S.C. § 5387(d). And the amount of funding that IHS sets aside as designated H&C funding to be spent on a particular program could certainly show what IHS would have otherwise spent on that program. It is not entirely clear from IHS's briefing whether it relies on that approach. But even if so, IHS would need to show, by "clear and convincing evidence," that it planned to limit its expenditures on the Clinic to that designated amount. *Id.* And while the record includes some indications that IHS had intentions to limit its spending on the Clinic (or close it altogether), *see, e.g.*, AR 144–45, 148, it also contains evidence that IHS had nevertheless been reaching far beyond its H&C budget and covering expenditures for both the Clinic and the EMS program using supplementary funds in prior years, *see* Defs.' Opp'n at 6; ECF No. 37-2 at 2, and that it had intentions to do so in 2016, *see* AR 125; *see also* Tso Decl. ¶¶ 6–8 (explaining that IHS did in fact use program income to fund the Clinic). That record cannot satisfy the heavy burden IHS must meet to show that IHS would have only provided the designated H&C funding for operation of both the EMS program and the Clinic for 2017.

Nevertheless, IHS argues that even if it would have spent third-party revenue to keep operating the Clinic had it retained control of the Clinic and the EMS program, use of *that* funding should not be considered when calculating the recurring amount under § 5325(a)(1) because IHS no longer collects it once it cedes operation of those programs—the Tribe does. *See* AR 36 (section of compact transferring clinic billing to the Tribe). That argument has substantial intuitive and practical appeal. If the Tribe stands to collect those revenues directly, why should IHS also have to match those funds, from some other source, in the recurring funding amount?

But IHS once again runs headlong into the language of the statute. Section 5325(a)(1) instructs that the Tribe is entitled to no less than the amount that IHS "would have otherwise provided for the operation of" the EMS program and the Clinic. The clear and unavoidable meaning of that provision is that IHS must provide in funding to the Tribe an amount that is at least equal to what it otherwise would have spent operating the EMS program and the Clinic itself. Nowhere does the statute provide exceptions based on the source of that funding, even if the particular source IHS had been using, upon transfer of operations to the contracting tribe, dematerializes. Rather, the provision focuses on the continued *operation* of the assumed programs at the same level of service, and it does so by ensuring that IHS provides the same amount in funding, as a recurring base amount, for that continued operation. It does not permit IHS to limit the award on the assumption, no matter how reasonable, that the Tribe will make up the difference elsewhere.[7]

---

[7] The Tribe also claims the weight of caselaw reached the same conclusion, though none of the cases it cites are particularly on point. First, the Tribe insists that this question was directly addressed by the court in *Pyramid Lake*, but that decision did not reach so far. In that case, IHS had been using third-party revenues from the Clinic to fund the *EMS program*. *See* 70 F. Supp. 3d at 544. IHS retained control of the Clinic, and thus would continue to collect those revenues even after the Tribe assumed control of the EMS program. *See id.* In other words,

Though IHS never refers to it, the Court notes that Title V *does* directly address Medicare, Medicaid, and other "program income earned by an Indian tribe." 25 U.S.C. § 5388(j). The relevant provision states that IHS, in transferring funding pursuant to a Title V funding agreement, shall treat that program income as "supplemental funding to that negotiated in the funding agreement" and that those funds "shall not result in any offset or reduction in the amount of funds the Indian tribe is authorized to receive under its funding agreement." *Id.* One might read that provision to imply that those third-party revenues should be considered entirely separate and apart from the recurring funding award. But § 5388(j) is *forward*-looking; it dictates how funds should be transferred *after* the parties have entered into the funding agreement and specified a particular recurring funding amount. *Cf. Swinomish Indian Tribal Cmty. v. Azar*, No. 18-cv-1156 (DLF), 2019 WL 4261368, *7–8 (D.D.C. Sept. 9, 2019) (concluding that third-party revenues expended by a tribe *in addition to* the recurring funding amount already agreed upon should not be considered for purposes of calculating contract-support costs). Subsection 5388(j) says nothing about whether, in determining that amount, previous expenditures should be discounted simply because the source of those expenditures was

---

unlike here, those resources were still available to IHS. The Tribe also relies on *Navajo Health Found.—Sage Mem'l Hosp., Inc. v. Burwell*, 263 F. Supp. 3d 1083 (D.N.M. 2016), in which the court found that expenditures on ISDEAA programs from third-party revenues should be considered funds "spent on the federal program." *Id.* at 1178. But the court in that case was examining the appropriate amount for purposes of calculating the *contract-support costs* after the fact, not the Secretarial amount under § 5325(a)(1). *See id.* at 1164. Finally, contrary to the Tribe's claim, the D.C. Circuit did not foreclose IHS's particular argument here in *Navajo Nation*. In that case, the Circuit rejected IHS's claim that it could not be required to accept the tribe's final offer, even though it failed to timely respond to it, if that offer exceeded the amount to which the tribe would have been entitled to under the Act. *See* 852 F.3d at 1130. That is, the Circuit merely held that because the Act does prohibit IHS from awarding *more* than the minimum amount prescribed in § 5325(a)(1), it was not contrary to the statute to order IHS to pay such an amount for failing to timely reject the offer. *See id.* In sum, none of those cases squarely presented the issue raised here.

third-party revenue. The dictate of § 5325(a)(1) is not simply that IHS must transfer the various pots of funding that it had been using to operate the programs at issue, but rather that IHS must agree to provide an amount, as *recurring funding*, not less than what it would have otherwise provided to operate the programs. Upon agreeing to that sum, IHS can meet that obligation however it sees fit.

The Court recognizes that this application of § 5325(a)(1)'s language to this situation leads to what may appear an illogical result, in that it seems to lead to double-recovery by the Tribe. But the Court must construe the Act "liberally . . . for the benefit of the Indian tribe participating in self-governance and [resolve] any ambiguity . . . in favor of the Indian tribe." 25 U.S.C. § 5392(f). Moreover, although not invoked by IHS, the general rule that statutes should not be construed to produce absurd results does not require a contrary outcome. *See, e.g.*, *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998). The ISDEAA, first and foremost, is aimed at ensuring that Indian tribes can assume control of their own health services at levels necessary to meet their needs. *See* 25 U.S.C. § 5302(a), (c). The result here—which ensures that the Tribe will receive the necessary funds to provide, at a minimum, the same services that IHS had already been providing—is not contrary to that aim, nor is it so absurd that it warrants disregarding the Act's clear text.

For these reasons, the Court finds that under the Act, IHS cannot deduct from the Secretarial amount expenditures that it would have otherwise made had it retained control of the programs at issue simply because it made those expenditures using funds from revenue streams that will, upon assumption of the program, flow directly to the Tribe. Given that conclusion, and the Court's conclusion as to the Winnemucca share, the Court finds that IHS has failed to show that the Tribe's final offer exceeded the amount to which it was entitled under the Act.

## C. Remedy

With the merits resolved, the Court is left to determine an appropriate remedy. As IHS points out, the ISDEAA does not mandate injunctive relief when IHS fails to meet its burden to show that it properly rejected a tribe's final offer. Rather, § 5331(a) provides that a court "*may* order appropriate relief . . . *including* immediate injunctive relief to reverse a declination finding . . . ." 25 U.S.C. § 5331(a)(1) (emphasis added). And IHS argues that, "[d]epending on this Court's decision, remand to negotiate the proper amount of H&C funding in accordance with the Court's holding may be appropriate." Defs.' Opp'n at 13. But the Court's conclusions lead to no suitable remedy other than the injunctive relief the Tribe requests—namely, an order requiring IHS to accept the recurring funding amount proposed in the Tribe's final offer. The Court has rejected, as a matter of law, the justifications relied on by IHS for declining the Tribe's proposed amount. And to the extent IHS has tried to muster sufficient evidence to otherwise show that it would not have spent the amount proposed by the Tribe on the EMS program and Clinic, it has failed to do so after being afforded multiple opportunities.[8]

As a result, because IHS has failed to carry its burden to show that it properly rejected the Tribe's proposal, and because remand for further negotiations would serve little purpose, the Court finds that an injunction requiring IHS to accept the recurring funding amount proposed by the Tribe and to amend the funding agreement accordingly is the appropriate remedy *See Pyramid Lake*, 70 F. Supp. 3d at 545 (noting that because the ISDEAA specifically provides for both injunctive and mandamus relief to remedy violations of the Act, a tribe "need not demonstrate the traditional equitable grounds for obtaining" that relief).

---

[8] *See supra* note 7.

## IV. Conclusion

For all the above reasons, the Court will grant Plaintiff's Second Motion for Summary Judgment, ECF No. 31, deny Defendants' Second Cross-Motion for Summary Judgment, ECF No. 33, and enter injunctive relief for Plaintiff. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 26, 2019